Thank you, Your Honor. May it please the Court, this case involves an architect-engineer indefinite delivery contract for services in Alaska for the Corps of Engineers. And the architect-engineers were to be selected according to evaluation factors that were advertised, and there were four primary factors and four secondary factors, or three secondary factors, that were to be tiebreakers. And the reason we're here, of course, is that initially there was a tie between my client, Weston Solutions, and another law firm, Northwind, and they were tied for third place. Three companies were to be selected. But isn't the operative word in that sentence, initially? Yes, Your Honor. Besides that, they conferred and discussed. Then there was a clear third-place finisher and a fourth-place finisher, right? Well, I would not agree clearly, Your Honor. I think those are the circumstances that we need to explore. First of all, I think the Court, isn't this a common sort of decision-making process? We've been engaged in that here. My views are very often affected and changed by those of my colleagues. We wouldn't want to interfere with that sort of decisional process, would you? Not when it's done in a rational basis, Your Honor. I think that the problem here is, remember, we're talking about a best value negotiated procurement. A great deal of subjectivity, quite naturally, and a great deal of deference to the government agencies. The only way that there can be effective judicial review is if a record is developed contemporaneous with the decisions that are made that is susceptible to that kind of review. And that explains something as critical as a shift in these ratings to break the tie. I think it bears mentioning how really unlikely a tie was here. You have four primary evaluation factors and four adjectival ratings that are to be assigned to them, and each one broken down to a zero, a minus, and a plus. So the odds on two people coming out absolutely tied in the first instance, to me, shows that that really was a tie. Okay, now how do you break it? Well, the government says we broke it by having interviews. And after the interviews, we convened again, and we decided that Northwind's rating by one of the three raters should be changed from good plus to excellent minus. And that took the scale. Based on a track record, they've actually done it. Well, they've actually worked this long distance and succeeded, right? Well, based on an interview question, remember, the court below didn't get its answer right away. One of the important things there is that the court below, first of all, found that the administrative record was found wanting. It gave the agency in its initial decision, which granted us an injunction, an opportunity to supplement the administrative record. The agency comes back with a supplement, and the court still isn't satisfied because the agency has still not articulated the explanation for what it did. I'm sorry to interrupt. I just realized the briefs indicate that the identity of the party you just mentioned is confidential. Do we need to be concerned about that? I don't think so, Your Honor. That was done in abundance of caution, but the awardees have been advertised. So the names of the top three awardees are publicly known. Well, then that solves the confidentiality problem for purposes of this argument. But that doesn't really adequately address the concern about, shall we say, overabundance marking of materials as confidential. That presents a problem for the court. We have to be concerned about that. It presents a problem potentially in terms of writing opinion. The parties are repeating the caution not to simply designate things confidential, unless they are really confidential. I understand that, Your Honor. And I apologize if we were a little bit too conservative in that regard. A great deal of time has gone by in the interim. The government's reply has been filed, and I've come to the conclusion that probably that particular name no longer needs to be redacted. But in the future, I will be more cautious, Your Honor, in keeping with your admonition. Very good. After the second remand, the agency finally comes back with an explanation, and the explanation is that, well, one rater who happened to be the chairman of the source election board changed the rating because of one question that he asked in the interview. And the question essentially was, how do you propose to effectively manage projects in Alaska when your program manager and your people are in Idaho and places all over the country? And the only thing we have to indicate the responsibility for is in the notes that were included in the administrative record. And the notes say, we'll use phone conferences with Anchorage. We'll have a program manager there 30% of the time, which means he won't be there 70% of the time. And we've done projects across the country before. I would argue, Your Honor, that that does not provide a rational basis for the conclusion that that concern that was expressed by the questioner, which goes to both geographic proximity and capacity of Northwind, was adequately answered by that response, sufficient to break the time. And I'm also very much concerned, Your Honor, about how late that is in coming. I would have expected to have seen in the source selection evaluation memorandum some statement about how the tie was broken and why it was broken. The source selection evaluation memorandum is the last document in the procurement chain. The interviews had taken place earlier. The change to the chart, which was simply the drawing of an arrow, was done previously to that. The source selection board knew the significance of that change and yet chose not to articulate any explanation or put any documentation in the administrative record. It took two remands for them to come up with this explanation. It raises the possibility, I believe that it was a somewhat arbitrary decision in the first place, a drawing of an arrow to move a grade, perhaps not knowing exactly why, not articulating why contemporaneously, and then coming up with it later. It certainly gives rise to some of the cases that have held that post hoc rationalization should not be accepted and that sometimes a post hoc rationalization masquerades as a preexisting or then existing interpretation. And I think that's what we have here. I think the then existing interpretation did not, by evidence in the record, rely on that particular explanation. These procurements are very competitive. And I believe that all periors have a right, because of their right to file protests and to challenge these things, to know that there will be a well-documented record that at least explains what happened. Now, that didn't happen here. And I would submit to the court that the explanation that was submitted after the fact doesn't really answer the question that was legitimately raised by Judge Firestone below. Now, there's a second element to this case as well, which goes to the fact that there were to be a number of resumes submitted expressing the qualifications of the people. There was a synopsis. Correct, Your Honor. The synopsis doesn't say that there are limited. But the synopsis- Resume. Because the vehicle in which the resumes are presented is the attached standard form 330 that's attached to the synopsis, which is a commonly used form for qualification statements of architect engineers. And it has its own set of instructions. Right. Resume. What the government is obtaining here, Your Honor, is a team. And it's a team of biologists and chemists and other people. And it's a personal services contract. It wants the qualifications from the people who will actually be on this team. So, if there's a need for these architect engineering services, this team that you propose and these specific qualified people that you propose could be the ones who are on that team. But can I say to you, I have two questions. Even one of them could be a breakthrough. Let me tell you about my background. Let me know which one you think is a better fit. Why are the contractors committed to do that, to show that that resource is impersonal? If it's solicited that way, Your Honor, I would agree. But here, they weren't told which ones were selected. As a matter of fact, in the briefing, it became that the government considered the various people that were proposed by Northwind and basically evaluated them on the basis of whoever they thought was best. Even Northwind does not know which one of the offered individuals is the one that the government would want on the team. Well, maybe because the government included any of them would be adequate. But the bottom line is, Northwind established its arbitrary expectations to be the most accurate, and it should have more than one credit committee. To me, Your Honor, I'm at a difficult burden for you to overcome, and the synopsis has its own limitations in it. But the synopsis on the standard form 330 do list the number of people for each position. It doesn't say or more, either. It doesn't say limit, but it tells you how many to propose. I think an analogy would be if I were playing a game of horseshoes with someone, and I get one shot, and my opponent gets three. That's unfair. Westing could have supplied many people as well. But you didn't read the fine print that said you could take as many shots as you want. But there wasn't any fine print that said that. I think what happened was that Northwind took some license with it. You know, Your Honor, there are cases in negotiated procurements that are analogous. For example, where someone submits five projects of past performance history when only three were required, when three were asked for. The government sometimes says, well, you gave us five, and we asked for three, so you're rejected. Another time, the government will say, well, we're only going to look at the first three since you gave us five. I think that that's probably the sort of thing that should have been done here. And the comment was made in the evaluation of Westing that Westing only provided the number required. That should not have been a disparaging thing. That should have been following the directions precisely. In my view, Your Honor, Northwind should not have been lauded for providing more. They probably should have been penalized. And what we don't know – It's not that this is arbitrary and superstitious. I'm not a great reviewer, but I have to be. I know both of them and see what's going to be their interior decision-making in these decisions. It's also arbitrary and superstitious. I'm sure that these decisions are true. I understand, Your Honor. And it does, I believe, fit in with the arbitrary umbrella. Because remember, it's by the narrowest of margins that this tie was broken. It considers somewhat the fact that Westing only provided the number required. It also considers the fact that Westing was not given proper – was not properly evaluated, while Northwind, on the other hand, was given a higher rating because of a very questionable answer to an interview question. And I think the combination of those leads to an arbitrary conclusion. I reserve some time. Thank you, Mr. Payne. You're welcome. May it please the Court. I'd like to start with the second point that Mr. Payne raised in terms of the court's standard of review. This court's standard of review is whether or not the decisions are always arbitrary and superstitious. Mr. Payne tries to elevate a clear synopsis requirement in terms of stating the minimum number to an arbitrary and superstitious result that he does not like. On the contrary, when we read the synopsis in terms of it says the minimum professional qualification, it doesn't state that that's the only number. And in fact, when we look at the synopsis as a whole, we see that the government wanted the best value. Throughout the synopsis, there is language that they want to determine the firms or firms that are most responsible and have the ability to accomplish the government's contractual needs. Within that, the more number of individuals that you have that could meet the requirement is sufficient. And in fact, when you read the synopsis, it states that more than one individual could qualify for more than one position. That is also suggestive that there was some flexibility in terms of the number. And last, Your Honor, as noted in the court's opinion below, Weston actually nominated an individual who was not one of the sources listed, and that is the deputy program manager, if I recall correctly. Therefore, even Weston sort of benefited from the synopsis. So therefore, we urge that this court find that their second point is not arbitrary appropriation. It should rule in favor of the government on that point. Now, moving to their first point, when you step back and look at Weston's argument, actually what they are arguing is that they did not, the government did not reach the answer that Weston would have reached. That, again, is not the standard of review. You have to look at whether or not the trial court abused its discretion in terms of court's finding that the administrative record was unclear as to whom the agency wanted third, as whom the agency wanted fourth. It was unclear. Mr. Austin, when dealing with such subjective judgments, excellence, good, pluses, minuses, how does the judicial body make any kind of meaningful review? Your Honor, in terms of when we look at the subjective nature of this evaluation, you do have to look at what the agency articulated and what the agency did. So when we look at the administrative record as a whole, we find that on the first page of the narrative summary, Northwind is ranked as third. When we look at the debriefing letters, Weston was not noted that it was, in fact, fourth behind Northwind. When we look at the rankings, the individual rankings with the narrative summary, Northwind is ranked third. Weston is ranked fourth. The only unclear portion of that narrative summary is the notation in Northwind where it says that they were ranked in the middle range of good to the low range of excellent. That is needed explanation. The court found that it needed explanation. It remanded it back to the agency for the explanation, and the agency articulated, ultimately, a rational basis for their decision. It must be a two-to-nine. Yes, Your Honor. Should we draw any conclusion from that? No, Your Honor. I mean, you know, in the sense that the agency explained the error. The error was in response to an individual's question. What they did not explain and what they ultimately explained, secondly, is what was that question. So there's nothing to be drawn with it. It was just more putting flesh on the answer. So I don't think there was anything adverse or any adverse inference that should be drawn from that. But when we look at what the agency articulated, it's perfectly rational. You had a situation where the agency was concerned about how responsive would Northland be, given the diverse location of their home office and their small anchorage office. And there was some concern. There was an interview phase. Those concerns were alleviated. One member said, oh, wow, I need to alter my choice, and that member did. He moved me there. Everything that the agency explained was in the record. And the judge just wanted to make sure that the agency, in fact, wanted Northland. And that is, in essence, what they did. That decision was not arbitrary. While Weston may disagree with that decision, mere disagreement is not a basis for altering the decision alone. My question is, Mr. Engelbartman, is that Patrick has canceled the court in relation to the mortgage. I don't know if you've seen the final statement. But I understand you've already reviewed the answer to the question, given what 70 percent of the time you were at the U.S. site. So how does that alleviate all members' concerns about him not being there for day-to-day operations? That question. Well, when you look at the supplemental response, the second of the supplemental response, where they listed Northland's responses to that question, Northland did not state simply that the program manager would be there 30 percent of the time, and that would alleviate the problem. They also explained that they had performed other contracts with the court regulators with the same diverse setup and they wouldn't have a problem. And they also had established communication among the different offices to help alleviate that problem. So Northland was aware that those diverse locations and the program manager may pose some difficulties, but they had solved those. And, in fact, even though the program manager may be not on site, the program manager still remained responsible for the day-to-day. And when you look at the narrative summary for Northland, you see that Northland had partnered with another firm that was in Anchorage that was actually bigger than Northland's Alaska offices. And so that also helps sway, if you will, the government's position towards Northland. So in the answer to your question, there is nothing wrong in terms of them saying, but the agency says that we acknowledge there's a significant 30 percent response, but you have explained how you were able to handle that issue. And one member individually said, hey, I agree with that. So, Your Honor, that is the crux of the agency decision-making process. It was a rational, well-thought-out process. Whereas someone else looking at the same information may reach a different result, that in and of itself is not a reason to invalidate the decision. Furthermore, Your Honor, subject to your informal questions, we urge that you affirm the decision as well as the trial court got it correct. Northland was there, and the agency ran the question, basically. Thank you, Your Honor. The answers that were given to the earlier question that are found in Appendix 193 that are relied upon as the basis for this elevated score are nothing worth shaking and really nothing new. It should not have come as any revelation to the government that the contractor intended to maintain frequent communication or that the program manager would have responsibility for day-to-day. I mean, all of the things that are stated there are basically things that must have been known and really were known to the government at that time. What they didn't know was that the program manager would not be there 70 percent of the time and as Judge Moore has pointed out, that doesn't seem to suggest on a rational basis that that would have alleviated any concerns. That is the basic reason that the appellant has so much question with this whole process. You don't think that there is that we're going to use cell phones to communicate without shaking and minusing court numbers, do you? No, Your Honor. I think even cell phones might not have come as a surprise. So, Your Honor, there was a tiebreaker in the solicitation. And, David, as I pointed out, the odds on a tie in the first place were really remote when it happened. Why not go to the three tiebreaker factors and let those come into play? You advertised that they would be used to break the tie. Why break the tie by moving an arrow and then explaining the movement of that arrow and the elevation of one score on this very, very tenuous basis that's explaining the answer to this question? It means that there's no real nexus between what was done and what's in the administrative record. There's no credibility to their record of having maintained management over long distances and many other contracts, including those in Anchorage, Alaska. No, but, Your Honor, it doesn't go to the specific question that was raised here about why Northland and not URSF had the same question. How do you do it? We have done it. But, Your Honor, it was known that they were a company that was in business and has done business with the government before. But there was a specific question about dealing in Anchorage when you're based in Idaho. And they said we've been doing it for years. And I would suggest, Your Honor, that that wasn't enough, that the government's question went a little deeper than that and they needed more explanation than, you know, for example, we're going to use a pole hook. And I see my time is up. Thank you for listening. Thank you. Our next case is a generous partner. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. This is a test.